273 N.E.2d 554 (1971)
Harold ROESCHLEIN (Reagin), Plaintiff,
v.
Marjorie THOMAS et al., Defendants.
No. 1270A198.
Appellate Court of Indiana, In Bank.
September 28, 1971.
*556 Nelson G. Grills, Collins, Grills & Suess, Indianapolis, for plaintiff.
Thomas & Thomas, Brazil, Theodore L. Sendak, Atty. Gen., Wendell C. Hamacher, Edw. W. Johnson, Deputy Attys. Gen., Indianapolis, for defendants.
PER CURIAM.
This is an original class action in which the plaintiff seeks to have the amendment revising Article 7 (the Judicial Article) of the Indiana Constitution which was ratified in the general election of November 3, 1970, declared illegal and void, and seeks an injunction restraining the Governor from acting until such amendment has been constitutionally adopted.
Plaintiff's predecessor commenced this action in the Clay Circuit Court on October 29, 1970 and it was subsequently removed to this Court on December 3, 1970 pursuant to IC 1971, XX-X-XX-X, Ind. Ann. Stat. § 3-2121 et seq. (Burns' 1968 Repl.).
Prior to removal, a Motion to Dismiss was filed by the Attorney General of Indiana on behalf of the Governor and oral argument was heard on this Motion February 10, 1971. The question was taken under advisement and on March 2, 1971 an order was issued that pursuant to Rule TR. 12 the Motion to Dismiss would be treated as a Motion for Summary Judgment. Both parties were then given twenty days from the date of the order to file any papers for the consideration of the court in ruling on the Motion for Summary Judgment.
On March 17, 1971, plaintiff filed an Affidavit with attached exhibits in support of a Motion for Summary Judgment and the next day filed a Petition Questioning the Qualification of Certain Judges of this court.
On April 19, 1971, this court heard oral argument relating to said Affidavit and Petition, the maintenance of this action as a class action, and at the same time, considered two further motions, i.e., Motion to Substitute a Party and a Motion to Intervene. The original plaintiff in this action having died since its commencement, Marcella Reagin sought to be substituted as a party plaintiff. Also, one Harold Roeschlein requested permission to intervene in this action as a party plaintiff.
We then entered orders on July 27, 1971:
1. Denying the Petition Questioning the Qualification of Certain Judges of this court.[1]
2. Denying the motion of Marcella Reagin to be substituted as a party plaintiff.
3. Allowing Harold Roeschlein to be made a party plaintiff in this cause.
Pursuant to Rule TR. 23(C) (1), an order was then issued on September 1, 1971 that this cause of action be maintained as a class action under Rule TR. 23(B) (1) (b).
Having thus disposed of these preliminary procedural matters, we must now decide the Motion for Summary Judgment. If no genuine issue as to any material fact *557 exists, then we are free to decide from the pleadings and affidavit before us whether the Constitutional Amendment revising Article 7 (the Judicial Article) was validly adopted by the electorate on November 3, 1970. Rule TR. 56.
A summary of the Judicial Amendment is sufficient for purposes of this opinion.[2] It completely revises the Judicial Article (7) of the Indiana Constitution, effective January 1, 1972. The method of selection of judges at the appellate level (Supreme Court and Court of Appeals) is changed from a partisan popular election system to one authorizing the Governor to select such judges from a list of three persons submitted to him by a nonpartisan nominating commission. After serving a short term a judge's name is submitted to the electorate for approval, and if approved he thereafter must be approved on a nonpartisan basis by the electorate at ten-year intervals. The Supreme and Appellate Courts are reorganized into a Supreme Court of from five to nine members and a Court of Appeals whose membership is set by the legislature. The office of Chief Justice of Indiana is created and a system of discipline, removal, and retirement of judges is established. Also, there are certain miscellaneous provisions which require the Supreme Court to retain exclusive appellate jurisdiction of certain criminal cases and limit its original jurisdiction; affect prosecuting attorneys and the operation of the Grand Jury; and remove justices of the peace as constitutional officers.
Plaintiff submits three propositions alleging defects in the procedures by which the Judicial Amendment was adopted.[3]
I. "The General Assembly did not comply with the terms of Article 16, § 1, of the Indiana Constitution in adopting the Joint Resolutions which permitted an amendment to Article 7 of the Indiana Constitution pursuant to Chapter 375 of the Acts of the 95th Session and Chapter 457 of the Acts of the 96th Session of the Indiana General Assembly."
II. "The Constitutional Amendment was not certified by the Secretary of State to the Clerks of the Circuit Courts of the various counties prior to its being placed on the ballot, and the notice of the election was not published by some Clerks."
III. "The description of the proposed Constitutional Amendment did not adequately and accurately identify the proposed Constitutional Amendment to permit an intelligent vote upon the Amendment by the electorate."
As we are bound to know the public records, including the acts of state officials, we take judicial notice of the fact that House Joint Resolution No. 6 (1967 Session) and House Joint Resolution No. 12 (1969 Session) proposing the Judicial Amendment were both duly authenticated by the Speaker of the House and by the President of the Senate.[4] Evans v. Browne, infra, 30 Ind. at page 520. We also take judicial notice of public history and on that basis recognize the fact that on November 3, 1970, a majority of the electorate voting thereon approved the judicial amendment. Smith v. Pedigo, (1896) 145 Ind. 361, 44 N.E. 363.
We shall consider these propositions in the order submitted by plaintiff.

*558 PLAINTIFF'S PROPOSITION NO. ONE
It is our opinion that the authentication of the joint resolutions by the presiding officers of the Legislature is conclusive evidence of the proper enactment and evidence from the journals or elsewhere is not admissible to determine whether the Legislature has complied with the requirements of Article 16, § 1 of the Indiana Constitution.
Plaintiff points to Article 16, § 1, of the Indiana Constitution which contains the method of proposing amendments:
"Any amendment or amendments to this Constitution, may be proposed in either branch of the General Assembly; and, if the same shall be agreed to by a majority of the members elected to each of the two Houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the General Assembly to be chosen at the next general election; and if, in the General Assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each House, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution." (Emphasis supplied.)
In particular, plaintiff refers to the language "such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals," alleging this was not done. Rhetorical paragraphs 4 and 5 of the Complaint state:
4. "That in the 95th Session of the General Assembly of the State of Indiana, House Joint Resolution No. 6 was amended by the Senate and the proposed amendment as adopted was never entered in the Journal of the House of Representatives, and the vote with yeas and nays thereon was not entered in the Journal showing the adoption of the amendment by a majority of the House of Representatives."
5. "That in the 96th Session of the General Assembly of the State of Indiana, House Joint Resolution No. 12 was amended in the Senate and the House of Representatives concurred in the Senate amendment being the only vote upon the above described amendment to the Constitution as finally adopted which vote was not by a majority of all members elected to the House of Representatives and such vote was not entered on the Journal of the House of Representatives."
Attempting to bolster the importance of these alleged violations, plaintiff further contends that "[a]n examination of the Indiana Senate Journal for the year 1967 will disclose that substantive amendments were made by the Senate Committee and were made on a second reading of House Joint Resolution No. 6."[5] This would mean the House and the Senate in voting upon the proposed Judicial Amendment did not vote upon the same "proposed amendment or amendments" as required by the language of Article 16, § 1. The defendant asserts that these changes are mere corrections of an unsubstantial nature. In view of the decision we reach, the character of the changes does not constitute a material issue of fact and therefore we do not need to determine whether the changes are substantial or unsubstantial.
Stated in its essential terms Proposition No. One is deceptively simple. Article 16, § 1, requires that when constitutional amendments are proposed in the legislature the amendment with the yeas and nays vote thereon shall be entered in the journals. In adopting the joint resolutions incorporating the Judicial Amendment this was not done and the same proposed amendment was not properly adopted in both houses of the Legislature and therefore the constitutional *559 amendment is void because it failed to follow these specific provisions of the constitution. Our constitution is a sacred document expressing the organic law of the State of Indiana and therefore must be strictly construed. The courts must look beyond the authentication of the presiding officers of the General Assembly to the journals for defects in the procedures required by the constitution in order to determine if the Enrolled Act or Joint Resolution is valid.
This was strong legal argument in Indiana in 1868. In 1851 our Supreme Court held in Skinner v. Deming, (1851) 2 Ind. 558, 560, that: "The defendants to this bill had a right to set up the fact that the bank was not chartered by the requisite vote and show it, if necessary, by the journals of the Michigan legislature." Citing Purdy v. People, 4 Hill, N.Y., 384. A few years later the same court decided Coleman v. Dobbins, (1856) 8 Ind. 156, where the court cited the New York case of Purdy v. People, and held that when a party claiming any right or defense growing out of the action of the assembly, brings the parts of the journal relied upon to the judicial knowledge of the Court, they will be inspected like other records, and the Court will determine whether the legislative action they record, on the bill in question, is in accordance with the constitution.
Legislative journals were referred to in other Indiana cases following Coleman v. Dobbins, supra, in order to determine the validity of the action of the General Assembly  McCulloch v. State, (1858) 11 Ind. 424, and Coburn v. Dodd, (1860) 14 Ind. 347. Plaintiff, however, cites none of these cases in support of his position.
Perhaps the reason is that in 1869 the doctrine of determining the validity of the action of the General Assembly by reference to its legislative journals was swept away like a sand castle in a flood tide of contrary judicial pronouncements, beginning with the landmark case of Evans v. Browne, (1869) 30 Ind. 514, and followed by seven Indiana Supreme Court decisions to the same effect, the last being in 1968.
Evans v. Browne, supra, specifically overruled the holding in Skinner v. Deming, supra, and the line of cases which followed that opinion. The court, in overruling Skinner, referred to the practice of examining the legislative journals as an "essentially mischievous doctrine" and added:
"This exact question has received the consideration of other American courts, who have thoughtfully and with careful steps reached the conclusion, that the authentication of the presiding officers of the legislature is conclusive evidence of the proper enactment of a law, and that they cannot look elsewhere to falsify it." (Citations omitted and emphasis supplied.)
The court was considering the validity of a bill which had been authenticated by the presiding officers of the two houses which was challenged on the grounds that a quorum of the house of representatives was not present at the time the bill was voted on. In refusing to investigate the legislative journals to determine if a quorum was present as required by a specific provision of the constitution, i.e., Article 4, Section 25, the opinion emphasized that in doing so the courts would invade the exclusive province of the legislature and thereby violate the constitution by such invasion. Such a determination was held to be a legislative function and not a judicial question.
The holding in Evans was repeated in Bender v. State, (1876) 53 Ind. 254, where the court held that courts of this state cannot look beyond the enrolled act of the legislature, to ascertain whether there has been a compliance with the requirement of the constitution, that "no bill shall be presented to the governor within two days next previous to the final adjournment of the General Assembly."
*560 Again, in 1883, the Supreme Court in Board of Commissioners of Madison County v. Burford, 93 Ind. 383, 384, held that:
"Courts are bound to respect as laws the properly authenticated acts of the Legislature, filed by the proper officers and received, in accordance with law, by the secretary of state and placed in the proper depositary. Issues of fact can not be formed for the purpose of investigating the mode of procedure of the co-ordinate departments of government  the executive and legislative. Judicial investigation stops with an examination of the title and contents of the act, and the evidence of its due attestation by the signatures of the Speaker of the House of Representatives and the President of the Senate, and its acceptance and filing, as an act of the Legislature, by the secretary of state." (Emphasis supplied.)
To the same effect is State ex rel. Board of Commissioners of Benton County v. Boice et al., (1894) 140 Ind. 506, 514, 40 N.E. 113:
"`Court should be very careful not to invade the authority of the legislature. Nor should anxiety to maintain the constitution, laudable as that must ever be esteemed, lessen their caution in that particular; for if they overstep the authority which belongs to them, and assume that which pertains to the legislature, they violate the very constitution which they thereby seek to preserve and maintain.'
"If the object of the constitutional requirement that the presiding officers should sign the bill passed, was to give the authenticity necessary to a definite rule, then the same reason must exist for refusing to go behind the enrolled act for the purpose of supporting it, as for its destruction. In either event, to go back of the constitutional authentication would be unauthorized." (Emphasis supplied.)
Commenting upon attacks on an act's validity in the manner of its enactment, the Supreme Court in State v. Wheeler, (1909) 172 Ind. 578, 580, 89 N.E. 1, 2, 19 Ann.Cas. 834, said:
"It is settled law in this state that, when an enrolled act is authenticated by the signatures of the presiding officers of the two houses, it will be conclusively presumed that the same was enacted in conformity with all the requirements of the Constitution, and that said enrolled bill contains the act as it actually passed, and it is not allowable to look to the journals of the two houses or to other extrinsic sources for the purpose of attacking its validity or the manner of its enactment. Evans v. Browne (1869) 30 Ind. 514, 95 Am.Dec. 710; Bender v. State (1876) 53 Ind. 254; * * * Stout v. Board, etc. (1886) 107 Ind. 343, 347, 8 N.E. 222; * * *." (Emphasis supplied.)
The now firmly entrenched rule enunciated in these cases was last recognized in 1968. See State v. Clark, (1968) 247 Ind. 490, 217 N.E.2d 588.
While these authorities make no mention of joint resolutions as such, the constitutional source for authenticating enrolled acts and joint resolutions is Article 4, § 25, of our constitution, which treats them alike:
"A majority of all the members elected to each House, shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed, shall be signed by the Presiding Officers of the respective Houses." (Emphasis supplied.)
The holding in Western Union Telegraph Co. v. Taggart, Auditor, et al., (1894) 141 Ind. 281, 40 N.E. 1051, specifically bears out our assumption that a duly authenticated joint resolution is treated the same as a duly authenticated bill under Article 4, § 25. In Western Union the court held that:
"The authentication of the act, in the manner provided in article 4, section 25, of the constitution, that `all bills and *561 joint-resolutions so passed shall be signed by the presiding officers of the respective houses,' is conclusive evidence that the act was duly passed in conformity with the provisions of the organic law of the state." (Emphasis supplied.)
There are, however, exceptions to the general rule that when an enrolled act or joint resolution is authenticated with the signatures of the presiding officers of the two houses, it will be conclusively presumed that it was enacted in conformity with constitutional requirements.
One such exception is illustrated by State ex rel. Mayr v. Marion Circuit Court, (1931) 202 Ind. 501, 508, 176 N.E. 626, 628, where the Supreme Court said:
"We may grant that courts cannot look behind the bill to the legislative proceedings when the act is duly and lawfully attested, yet, when the very fact of the attestation of a bill is alleged to be due to fraud and mistake of fact or to have been recalled, we believe that the courts have the right and the duty to determine such questions." (Emphasis supplied.)
Another instance where courts may examine the journals of the Senate and the House is where a statute is ambiguous and in order to determine its true meaning, the journals are examined for legislative intent. In so doing, the authentication of the statute itself is not in question. This has long been the law in Indiana. In 1880 the Supreme Court stated in Edger v. Board of Commissioners of Randolph County, (1880) 70 Ind. 331, that:
"Where, as in this case, a statute has been enacted, which is susceptible of several widely differing constructions, we know of no better means for ascertaining the will and intention of the Legislature, than that which is afforded, in this case, by the history of the statute, as found in the journals of the two legislative bodies."
Also see Stout v. Board of Commissioners of Grant County, (1886) 107 Ind. 343, 8 N.E. 222.
There is no hint in the case at bar that House Joint Resolution No. 6 or House Joint Resolution No. 12 were not duly and lawfully attested by the signatures of the presiding officers nor is there any suggestion the attestation on the Joint Resolutions was due to fraud or mistake of fact. No question is raised as to the legislative intent of the respective Joint Resolutions, so no reason is presented by plaintiff why we should not be bound by the firmly established general rule preventing courts from looking behind the authentication of the act or joint resolution to the journals of the houses.
Plaintiff fails to come to grips with Evans v. Browne, supra, and the line of similar decisions following that important case. Instead, plaintiff exclusively concerns himself with repeated quotes from Indiana cases enunciating the well-established doctrine that constitutions are to receive strict construction. We completely agree with his soul-stirring quotes from these cases proclaiming the sacredness of the organic law of our state, and while they are interesting, they are not determinative of the question before us.
Plaintiff leans heavily on Ellingham v. Dye, (1912) 178 Ind. 336, 99 N.E. 1, for succor. In this case the legislature created a unique situation by adopting in the form of a bill a proposed new constitution to be submitted to the people. It did so in the guise of an exercise of legislative power without following the specific provisions of section 1 of Article 16 setting forth the manner of proposing amendments to the constitution. The question became one of determining whether this act incorporating a total new constitution was a valid exercise of legislative power or on its face was a violation of the terms of Article 16, § 1. No question was raised as to the authentication of the bill or of looking *562 to the journals of the houses of the General Assembly for defects in procedures required by the constitution.
The court exhaustively discussed the importance of making constitutional law and distinguished that process from ordinary legislation. The majority opinion stated that "there was no pretense of complying with or proceeding under provisions of the present Constitution for amendment of it."
The rationale of this decision is that the constitution as the fundamental law of the state only permits the legislature to propose amendments to the constitution by following the steps required by Article 16, § 1. Since there was no pretense of following these steps, the legislature acted without authority as was apparent on the face of the bill.
The legislature in the 1967 and 1969 sessions acted in good faith by following the steps required in proposing an amendment and its action in so doing was duly authenticated by the presiding officers of the legislature. On its face it was acting pursuant to specific constitutional authority and not contrary thereto as in Ellingham.
Plaintiff must also contend with a presumption of constitutionality. The party questioning the constitutionality of action of the legislature must assume the burden of overcoming a strong presumption favoring the constitutionality of such actions. State v. Clark, (1966) 247 Ind. 490, 217 N.E.2d 588.
The imperfection in plaintiff's argument that the journals of the General Assembly should be viewed to invalidate the joint resolutions proposing the Judicial Amendment is that it fixes its gaze with tunnel-like vision on part of Article 16, § 1, requiring the yeas and nays to be entered in the journal, and ignores other equally important parts of the Indiana constitution. Like plaintiff, we are concerned with strict construction of the constitution, but our concern extends to all of its provisions. Those which relate to each other must be construed in pari materia. Welsh v. Sells, (1963) 244 Ind. 423, 193 N.E.2d 359; Kirkpatrick v. King, (1950) 228 Ind. 236, 91 N.E.2d 785.
Article 3, § 1, of our organic law provides:
"The powers of government are divided into three separate departments: the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this constitution expressly provided." (Emphasis supplied.)
The recording of the yeas and nays required by § 1 of Article 16 is a legislative function exclusively within the sphere of the legislature, according to the terms of this provision, and the courts have no right to exercise that function. Evans v. Browne, supra.
The function of recording the yeas and nays in the journals of the two houses of the legislature is, by its very nature, legislative in character, as is authentication. Inquiries into such facts as the presence of a quorum or whether yeas and nays are recorded in the journal must be determined by the legislature itself. As the court said in Evans v. Browne, supra, "No other tribunal can so well ascertain the fact as itself * * *. The form of our State government was intended to make these two departments co-equal but separate and independent of each other, each having distinct functions to perform, and wholly beyond the control of the other." The framers of the constitution must also have contemplated such action to be exclusively legislative when they adopted the language of Article 4, § 25, which states:
"A majority of all the members elected to each House, shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed, shall *563 be signed by the Presiding Officers of the respective Houses." (Emphasis supplied.)
A fair construction of this language is that it is the presiding officers of the legislature, not the courts nor the executive, who exercise their official duties as officers of the legislature to authenticate "all bills and joint resolutions."
The rule of Evans v. Browne has a timeless quality because it rests upon preserving the sanctity of the constitution's principles defining the very framework of our organic law. By indulging in the conclusive presumption that a duly authenticated act or joint resolution was enacted in conformity with the constitution, we are not perpetuating a needless legal fiction. The reasons for precluding an inquiry into the possible defects of legislative proposals amending the constitution are just as powerful today as they were in 1869 when Evans v. Browne was decided. We would summarize them in this manner:
1. The need to recognize and preserve the independence and separateness of each of the three branches of government and the functions to be performed by them. The importance of the separation of powers doctrine is well stated in Book v. State Office Bldg. Comm., et al., (1957) 238 Ind. 120, 159, 149 N.E.2d 273, 293:
"Article 3, § 1, of the Constitution of Indiana is the keystone of our form of government and to maintain the division of powers as provided therein, its provisions will be strictly construed. Warren v. Indiana Telephone Co., 1940, 217 Ind. 93, 101, 26 N.E.2d 399."
Also see Evans v. Browne, supra.

2. A factual investigation as to whether constitutional procedures have been followed in proposing amendments to the constitution by joint resolution can best be conducted by the legislature, which is most suited for that purpose. Evans v. Browne, supra. In Ex Parte Wren, (1886) 63 Miss. 512, the court made the point this way:
"The fundamental error of any view which permits an appeal to the journals to see if the constitution has been observed in the passage by both houses of their enactments, is the assumed right of the judicial department to revise and supervise the legislative as to the manner of its performance of its appointed constitutional functions. It is the admitted province of the courts to judge and declare if an act of the legislature violates the constitution, but this duty of the courts begins with the completed act of the legislature." (Emphasis supplied.)
3. Courts have no right to assume that the action of the authenticating officers as public officials is false or fraudulent. In Evans v. Browne the court said:
"It is neither modest nor just for judges thus to impeach the integrity of another department of government and to claim that the judiciary only will be faithful to its obligations."
4. To countenance inquiries into the journals of the legislature is to expose every act and joint resolution of the legislature to the mercy of those having access to the journals and thereby create an atmosphere conducive to fraud. Pangborn v. Young, 32 N.J.Law (3 Vroom) 29, says it very well:
"It is scarcely too much to say that the legal existence of almost every legislative act would be at the mercy of all persons having access to these journals; for it is obvious that any law can be invalidated by the interpolation of a few lines or the obliteration of one name and the substitution of another in its stead. I cannot consent to expose the state legislation to the hazards of such probable error or facile fraud." (Emphasis supplied.)
*564 We now reaffirm the repeated stand taken by our Supreme Court that courts should not look beyond the authentication of the presiding officers of the legislature to determine from their journals whether there has been a defect in following the constitutional directives of Article 16, § 1.

PLAINTIFF'S PROPOSITION NO. TWO
It is our opinion that the failure of the Secretary of State and some clerks of the Circuit Courts to comply with the statutory requirements for certification and notice does not invalidate the Judicial Amendment.
Plaintiff alleges and supports with affidavit the failure of the Secretary of State to certify the proposed Constitutional Amendment to the Clerk of the Circuit Court of each county as prescribed by I.C. 1971, 3-1-15-1, Ind. Ann. Stat. § 29-4201 (Burns' 1969 Repl.).
He also alleges that in an undetermined number of counties the Clerk of the Circuit Court did not publish notice of the election upon the Constitutional Amendment as required by Burns' § 29-4201, supra, which reads as follows:
"Whenever a proposed constitutional amendment or other question is to be submitted to the people of the state for popular vote at a general election, the secretary of state, not later than September 1 next prior to such election, and when submitted at a special election, not less than thiry [30] days prior thereto, shall duly certify the same to the clerk of the circuit court of each county in the state, and the clerk of each county shall include the same in the publication provided for in section 90 [§ 29-3608], of this act * * *." (Emphasis supplied.)
Thus plaintiff is arguing that the Judicial Amendment is invalid because of the failure of the Secretary of State to certify the Judicial Amendment and the additional failure of some county clerks to include it in the notice of the General Election of November 3, 1970. This, he contends, breaks the chain of steps necessary to properly submit a constitutional amendment to the electorate.
This argument comes to us singularly unencumbered with applicable authority. It amounts to nothing more than a bald assertion that the Judicial Amendment is invalid because certain details of the election laws were not followed verbatim.
Plaintiff refers us to Burns' § 29-4201, supra, set forth above, but makes no reference to the companion statute I.C. 1971, 3-1-21-2, Ind. Ann. Stat. § 29-4802 (Burns' 1969 Repl.), which bears on this subject:
"The clerk of the circuit court of each county shall give notice of any such election (general election) and publish a statement or certificate showing what offices are to be filled at the time and in the manner provided in section ninety [§ 29-3608] of this act [chs. 28-60 of this title]. But no election shall be invalidated by the failure of such clerk of the circuit court in the performance of any of the duties enjoined by this section." (Emphasis supplied.)
The italicized portions unequivocally state the legislative intention that failure of the clerk to publish notice is not grounds for invalidating an election where a constitutional amendment is submitted and the same intent can be read into the statute with respect to certification.
Plaintiff admits that the issue of certification and the publication of notice has been raised after the date of the election. Unfortunately, this brings him within the ambit of Schafer v. Ort, (1931) 202 Ind. 622, 177 N.E. 438,[6] which rather handily disposes of such defects:

*565 "Before an election, statutory rules and regulations of the conduct thereof may be regarded as mandatory and their observance may be insisted upon and enforced. After an election, they must be regarded in a different light. `If the statute provides that certain things shall be done at a particular time or in a particular manner and does not declare that their performance shall be essential to the validity of an election, they will be regarded as mandatory if they affect the merits of the election, and as directory only if they do not affect its merits.' Parvin v. Wimberg (1892), 130 Ind. 561, 568, 30 N.E. 790, 792, 15 L.R.A. 775, 30 Am.St.Rep. 254. The problem is to secure a free and untrammeled vote and a correct record and a return thereof, and a departure from the statute which does not deprive legal voters of their right to vote or permit illegal voters to participate in the election or cast uncertainty on the result, does not affect the validity of the election. Norman v. State, ex rel. (1912), 51 Ind. App. 425, 99 N.E. 812; Lafayette, etc., R. Co. v. Geiger (1870), 34 Ind. 185, 230; 9 R.C.L. 1091; 20 C.J. 181." (Emphasis supplied.)
Nowhere do we find any allegations that voters were denied their right to vote or that illegal voters were allowed to participate in the election or that the vote was not free and untrammeled due to the failure to certify and publish notice as prescribed by Burns' § 29-4201, supra.
The language of Burns' § 29-4802, supra, providing that no election is invalidated by reason of the failure of the clerk to give notice prior to the election indicates the intention of the legislature that the giving of notice is directory and not mandatory. Therefore, the failure of publication of such notice in certain counties does not invalidate the judicial amendment. The same is true of the failure of the Secretary of State to certify the judicial amendment to the clerk of each county's Circuit Court. Both of these alleged defects are not sufficient to invalidate the judicial amendment after the action of the electorate in adopting the amendment by a majority voting thereon on November 3, 1970. Schafer v. Ort, supra.

PLAINTIFF'S PROPOSITION NO. THREE
It is our opinion that, as a matter of law, the language used on the ballot was sufficient to meet the requirements of IC 1971, 3-1-15-2, Ind. Ann. Stat. § 29-4202 (Burns' 1969 Repl.) and IC 1971, 3-1-15-4, Ind. Ann. Stat. § 29-4204 (Burns' 1969 Repl.). The language adopted by the State Election Board on August 6, 1970, and used on the ballot, reads:

*566 CONSTITUTIONAL AMENDMENT NO. 2.
Judicial Article
"Shall Article 7 (Judicial) of the Constitution of the State of Indiana be repealed and re-enacted to change the present Constitution as follows: Reorganize the Supreme and Appellate Courts into a Supreme Court of from 5 to 9 members and a Court of Appeals, the number of whose members will be set by the legislature; create the office of Chief Justice of the Supreme Court; permit incumbent members of Supreme Court and Appellate Court to hold over till their respective elective or appointive terms end, subject to the general election immediately preceding expiration of their terms to voter approval or rejection for an additional 10-year period; provide for filling vacancies by the Governor from lists of nominees submitted by a seven member non-partisan Commission and provide for voter approval or rejection of such judges after 2 years of service and every 10 years thereafter; abolish the Clerk of the Supreme Court, and Justices of the Peace as constitutional officers; provide an additional system of discipline and removal of judges by the Supreme Court; and certain other changes?
"This amendment is submitted pursuant to Chapter 375 of the Acts of the 95th session and Chapter 457 of the Acts of the 96th session of the Indiana General Assembly."
Plaintiff alleges in his complaint and recites specific instances in his Memorandum[7] that the description of the Judicial Amendment on the ballot did not adequately and accurately identify it so as to permit intelligent voting by the electorate and, further, that the language of the description was misleading.
In approaching this issue, we are guided by two specific statutes. Plaintiff makes no reference to § 29-4202, supra, which reads in pertinent part:
"Whenever any constitutional amendment or other question is required by law to be submitted to popular vote, if all the electors of the state are entitled to vote on such question, the state election board shall cause a brief statement of the same to be printed on the state ballots, * *." (Emphasis supplied.)
Also, § 29-4204, supra, states in part:
"The proposed constitutional amendment or amendments shall be stated on such ballots in words sufficient to clearly designate the same, and such statement or statements shall be printed in a separate column on the official ballot. * * *" (Emphasis supplied.)
By the positive, unambiguous wording of these statutes the State Election Board is only required to cause a brief statement designating the constitutional amendment to be printed on the state ballots. It must inform the voter as to the particular amendment to be voted on and need not educate the voter by spelling out the entire amendment. The "brief statement" of the Amendment on the ballot is intended as a means of identification.
This precise question has been previously litigated in this jurisdiction. In Oviatt v. Behme, (1958) 238 Ind. 69, 147 N.E.2d 897, the Indiana Supreme Court analyzed the adequacy of language describing a constitutional amendment which extended the terms of certain county officials from two to four years. After pointing out the absence of any mandatory language in the constitution concerning this subject, the court held that even though an important limitation was omitted in the ballot description, the language used was adequate.
*567 The specific rule laid down in Oviatt v. Behme, supra, is:
"So long as the amendment is sufficiently identified and is not confused with any other amendments, submitted at the time, we, as a court, do not have the right to strike it down on any theory that the legislature failed to use good judgment in the method of submitting the amendment. Some amendments may be so lengthy that it would create a physical and mechanical problem in setting them forth on a ballot or voting machine. Appellees further point out that the Constitution of 1852, when it was submitted to the voters of this State for approval, was not printed in full or even the substance thereof set out on the ballots. Acts 1851, ch. 29, § 3, p. 54. The amendment in question was sufficiently identified and properly ratified." (Emphasis supplied.)
The contents of the "brief statement" of the Judicial Amendment, appearing as Constitutional Amendment No. 2, not only adequately designated the Judicial Amendment but went further than identification by summarizing the principal features of the Judicial Amendment. Further, since there was only one amendment relating to the judicial system, we are hard pressed to see any logical basis for confusion or uncertainty in the minds of the electorate.
Plaintiff expresses numerous specific dissatisfactions with the language of the "brief statement," none of which have the benefit of supporting authority. They amount to nothing more than his disapproval of the Judicial Amendment. In view of Oviatt v. Behme, supra, and the applicable statutes they merit no further consideration.
The Attorney General urges upon us certain cases, and we have found others, which would dispose of all three of plaintiff's Propositions on various grounds. In each of them there are alleged or presumed constitutional defects in the submission and adoption of amendments to a state constitution. For example, constitutional amendments have been upheld where the provision in the constitution that is violated is held to be directory only.[8] Such holdings are generally condemned because they trifle with the sanctity of organic law. Another judicial approach upholding constitutional amendments where there exists a defect in following a constitutional directive, is represented by State ex rel. Thompson, Attorney General v. Winnett et al., (1907) 78 Neb. 379, 110 N.W. 1113. The court in this case relied on the principle of substantial compliance to uphold the amendment.
Some courts have favored a doctrine of ratification to cure defects in the adoption of constitutional amendments. Florida and Kansas boldly state that:
"While it is true that the procedure set forth in Section 1 of Art. XVII is mandatory and should be followed (Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, Ann.Cas. 1914B, 916; Gray v. Childs, 115 Fla. 816, 156 So. 274), this Court has recognized the almost universal rule that once an amendment is duly proposed and is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before them, the effect of a favorable vote by the people is to cure defects in the form of submission. * * *" (Emphasis supplied.) Sylvester v. Tindall, (1944) 154 Fla. 663, 18 So.2d 892, at p. 895.
"In upholding the ratified amendment as against the attack so made upon it, this Court in the West Case, supra, definitely and conclusively aligned itself with the doctrine of a majority of the American courts that in ruling upon the validity of constitutional changes after the popular voice has been expressed *568 * * * and that mere formal or procedural irregularities in the framing, manner, or form of submission or balloting, will not be held fatal to the validity of such amendment * * *." (Emphasis supplied.) State ex rel Landis Atty. Gen. v. Thompson, (1935) 120 Fla. 860, 163 So. 270, p. 276.
"Is a proposition to amend the constitution in the nature of a criminal proceeding, in which the opponents of change stand as defendants in a criminal action, entitled to avail themselves of any technical error, or mere verbal mistake; or is it rather a civil proceeding, in which those omissions and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly, we affirm the latter. The central idea of Kansas law, as of Kansas history, is, that substance of right is grander and more potent than methods and forms. * * *" (Emphasis supplied.) Prohibitory Amendment Cases, (1881) 24 Kan. 700, at p. 710.
This doctrine is not as widely followed as Florida would have us believe. In fact, Sylvester v. Tindall, supra, which is most widely quoted for this proposition, does not support the doctrine. Our scrutiny of the case indicates there was a violation of a statutory directive, not a constitutional directive. Other Florida cases such as Collier v. Gray, (1934) 116 Fla. 845, 157 So. 40, and West v. State, (1905) 50 Fla. 154, 39 So. 412, do broadly define and apply the principle. However, in Graham v. Miller, (1957) 348 Mich. 684, 84 N.W.2d 46, Michigan rejected the doctrine.
We assume that in deciding Evans v. Browne, supra, our Supreme Court could have applied the doctrine but chose not to do so. Our research reveals no Indiana cases specifically embracing the doctrine in whole or part, although a trace of it might be said to appear in Oviatt v. Behme, supra, where the court said:
"The amendment in question was sufficiently identified and properly ratified." 238 Ind. at p. 73, 147 N.E.2d at p. 900.
We must agree that the doctrine of ratification and the principle of substantial compliance have sufficient vitality to overcome plaintiff's three Propositions, but we ground our decision solely on the Indiana authorities and statutes specifically indicated above.
Finding no genuine issue as to any material fact, it is hereby ordered that summary judgment should be and hereby is, as a matter of law, entered against the plaintiff and in favor of the defendants.
NOTES
[1] This action was taken on the ground that the title to office of one in actual exercise of the office cannot be attacked in a collateral proceeding. Osborne v. State, (1891) 128 Ind. 129, 27 N.E. 345; Case v. State, (1879) 69 Ind. 46; Gumberts v. Adams Express Co., (1867) 28 Ind. 181; Creighton v. Piper, (1860) 14 Ind. 182; and Leonard v. City of Terre Haute, (1911) 48 Ind. App. 104, 93 N.E. 872.
[2] See Ind.Const. art. 7, § 1 et seq. (Burns' 1970).
[3] "Memorandum In Opposition In [sic] Motion To Dismiss Filed by Governor Edgar Whitcomb," filed by plaintiff February 9, 1971.
[4] For 1967, see Senate Journal p. 1285 and House Journal p. 1288; for 1969, see Senate Journal p. 1125 and House Journal p. 1291.
[5] See note 3.
[6] Cited and followed with approval in Black v. Smith, (1936) 209 Ind. 571, 200 N.E. 215, where the court said:

"The only question presented by this appeal is whether a failure of the election board to keep a poll list, and a failure of all the voters who voted to sign a poll list, will invalidate the election and make illegal all of the votes cast in the precinct, notwithstanding all of the voters were qualified voters, and all of the votes cast otherwise legal and valid. It is said in Jones v. State ex rel. Wilson (1899), 153 Ind. 440, 451, 55 N.E. 229, 233: `It is the duty of the courts to uphold the law by sustaining elections thereunder that have resulted in a full and fair expression of the public will, and, from the current of authority, the following may be stated as the approved rule: All provisions of the election law are mandatory, if enforcement is sought, before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.' This must be treated as the settled law of this state. Schafer v. Ort (1931), 202 Ind. 622, 177 N.E. 438; State ex rel. Harry et al. v. Ice et al. (1934), 207 Ind. 65, 191 N.E. 155; Lumm v. Simpson (1935), 207 Ind. 680, 194 N.E. 341." Also see Brown v. Grzeskowiak, (1951) 230 Ind. 110, 101 N.E.2d 639.
[7] "Memorandum In Opposition In [sic] Motion To Dismiss Filed by Governor Edgar Whitcomb," filed by plaintiff February 9, 1971.
[8] Armstrong v. Klug, (1924) 281 Pa. 207, 126 A. 263.